UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARTIN SOROKA,<br><br>   Petitioner,<br><br> v.<br><br>NANCY A. BERRYHILL, Commissioner of Social Security,<br><br>   Respondent. | No. 1:17-cv-01571-GSA<br><br>**ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF COMMISSIONER OF SOCIAL SECURITY AND AGAINST PLAINTIFF** |

**I. Introduction**

Plaintiff Martin Soroka ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for Supplementary Security Income ("SSI") pursuant to Title XVI of the Social Security Act. The matter is currently before the Court on the parties' briefs which were submitted without oral argument to the Honorable Gary S. Austin, United States Magistrate Judge.[1] *See* Docs. 15, 16 and 17. Having reviewed the record as a whole, the Court finds that the ALJ's decision is supported by substantial evidence. Accordingly, Plaintiff's appeal is denied.

**II. Procedural Background**

On April 29, 2014, Plaintiff filed an application for supplemental security income alleging disability beginning May 10, 2012. AR 19. The Commissioner denied the application initially on

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. *See* Docs. 7 and 8.

1

October 9, 2014, and upon reconsideration on January 22, 2015. AR 19. On February 26, 2015, Plaintiff filed a timely request for a hearing before an Administrative Law Judge. AR 19.

Administrative Law Judge Andrew Verne presided over an administrative hearing on November 7, 2016. AR 35-80. Plaintiff, represented by counsel, appeared and testified. AR 35. An impartial vocational expert Sonia Peterson (the "VE") also appeared and testified. AR 35.

On January 12, 2017, the ALJ denied Plaintiff's application. AR 19-30. The Appeals Council denied review on September 21, 2017. AR 1-4. On November 22, 2017, Plaintiff filed a timely complaint seeking this Court's review. Doc. 1.

### III. Factual Background

Alleging that he is disabled by multiple sclerosis ("MS"), Plaintiff (born November 7, 1989) seeks supplemental security income. He has a felony criminal history, including drug dealing and domestic assault, for which he was incarcerated. AR 179, 345. His work history reflects a few short-term jobs and a longer-term work study job while a student. AR 185-88, 204.

#### A. Plaintiff's Testimony

Plaintiff has never worked full time. AR 43. He testified that he could not work now because some days he was unable to walk and needed to use a wheelchair. AR 44, 51. He could stand and walk two hours a day with medication but would experience pain. AR 44. He could not sit for six hours in an eight-hour day. AR 44. He receives monthly infusions of medication which require two hours, plus transportation time. AR 46.

Plaintiff testified that his driver's license was suspended after he was diagnosed with MS in 2014, but was not clear about the reason for the suspension. AR 40-42. He completed a GED and attended community college but failed to complete his course of study. AR 42. Plaintiff testified that he left school without finishing because of a MS flare up. AR 42.

Plaintiff recently had to change medications. AR 47-48. The new medication caused pain but enabled him to walk. AR 48. He testified that his physicians Dr. McLaughlin and Dr. Koshy did not need to impose any restrictions on his activities because "they already know I can't do

///

that." AR 49-50. Plaintiff depended on his mother to manage his care and administer his medications. AR 50.[2] He reported taking 15 pills daily. AR 53.

Plaintiff was no longer receiving mental health treatment. AR 52-53. He did not need treatment for smoking, drinking or illegal drug use because he did not use those substances. AR 53. In response to his attorney's questions, however, Plaintiff testified that he had "like three other people in me," but felt awkward speaking about that. AR 56. He had stopped seeing his "psych doctor," "who literally made me feel like I wanted to kill myself. He made me feel like I was inept or like I wasn't human because I had MS, so I stopped going." AR 56. Plaintiff experienced "crazy mood swings." AR 57. His manic episodes (described by his attorney as having "a lot of energy and want[ing] to do a lot of things") were cut short by his physical limitations, specifically clumsiness. AR 57-58. Finally, when his attorney asked if Plaintiff had anything important that the ALJ needed to know, Plaintiff responded:

> The last two years of my life, knowing that I have MS hasn't really been much easier. Like it sucks. I've—I don't know. I've had psych doctors make me want to kill myself. I mean. I've been through the whole entire roller coaster ride and honestly, I'm just—I'll do whatever it needs to be done, just let me know and—I'm not lying. I am disabled.

AR 58.

### B. Brother's Testimony

Plaintiff's older brother, Leonty Soroka, did not think Plaintiff was able to hold a job because he had MS flare-ups several times daily, was clumsy, had spasms, and fell.[3] AR 73-75. Plaintiff was unlikely to complete a single day of work because he moved too slowly and was off-task about 98 per cent of the time. AR 75. Plaintiff's aging parents had become frustrated with Plaintiff and had moved him out of the family home to a mobile home they purchased for him.

---

[2] *See also* AR 211-219 (Third Party Adult Function Report of Plaintiff's mother Larisa Soroka, reporting that Plaintiff was generally unable to do anything for himself).

[3] Leonty Soroka apparently intended to refer to an occurrence of MS symptoms, not an MS flare-up. An MS flare-up is one of several terms used to describe an intermittent exacerbation of MS symptoms. www.nationalmssociety.org/Treating-MS/Managing-Relapses (accessed November 27, 2018). "To be a true exacerbation, the attack must last at least 24 hours and be separated from the previous attack by at least 30 days. Most exacerbations last from a few days to several weeks or even months." *Id.*

AR 72-73. Noting that Plaintiff had fallen asleep behind the wheel on several occasions, Leonty Soroka stated, "I wouldn't put him behind the wheel of anything." AR 77.

Asked about Plaintiff's prognosis, Leonty Soroka testified:

> When I talk to the doctors, the doctors say that if [Plaintiff] can treat himself—like if [Plaintiff] can live an adult life and not be a 27-year-old in this problem, if he could be an adult about his disease, he could stay out of a wheelchair until he's in his 50's. Stay out of a wheelchair doesn't necessarily mean he can actively be walking with purpose. When he walks, like I was telling him, if I were to walk 30 feet and you could put 13 obstacles, I will literally walk over and step around every single obstacle. If you give [Plaintiff] the same task, 30 minutes later he has hit every single obstacle. And in your opinion, you are looking at this man frustrated out of your mind because you feel, you truly feel that he has intentionally collided with every single thing you put in his way.

AR 76-77.

Leonty Soroka testified that Plaintiff had always failed at everything he tried and was never given responsibilities at home like Leonty, and Plaintiff's other brothers. AR 71. He said that the entire family had now become frustrated with Plaintiff, who refused to grow up and move forward to deal with his illness maturely. AR 78-79.

### C. **Medical Records**

After going to the emergency department with lower leg numbness and weakness, Plaintiff was hospitalized at Riverside County Regional Medical Center from April 15-22, 2014. AR 307. Using MRIs and lumbar puncture, doctors diagnosed multiple sclerosis and methamphetamine abuse. AR 307, 316-23. Plaintiff was treated with Solumedrol for five days. AR 307.

When Plaintiff began treatment with neurologist Ruby Koshy, M.D., on May 5, 2014, he was experiencing weakness, depression and shortness of breath and had impaired motor function and numbness in his lower extremities. AR 469. Dr. Koshy observed that Plaintiff was doing much better following his hospitalization. AR 470.

Plaintiff was again hospitalized in May 2014. AR 329. On May 19, 2014, psychiatrist D. Dante DiNicola, M.D., conducted a psychiatric evaluation regarding Plaintiff's mood changes and

irritability. AR 301. Plaintiff acknowledged experiencing anxiety but denied depression and drug and alcohol abuse. AR 301. When MRI studies performed on May 21 and 23, 2014, were contrasted with those of the prior month, they revealed no additional lesions in Plaintiff's brain and spinal cord as well as decreased enhancement indicating decreasing or resolved demyelination of the lesions. AR 303-06. Testing also revealed that Plaintiff carried antibodies against the John Cunningham virus ("JC virus").[4] AR 454.

When Dr. Koshy saw Plaintiff on June 4, 2014, he was extremely sedated from a morphine prescription and slurred his speech. AR 467. Plaintiff was experiencing difficulty sleeping, urinary incontinence, and trouble walking. AR 467.

On June 12, 2014, Isabel Akerlundh, BHS, conducted an intake interview of Plaintiff at the Riverside County Department of Mental Health. AR 269-75. Akerlundh diagnosed bipolar disorder, personality disorder not otherwise specified, and multiple sclerosis. AR 269. Plaintiff reported that he had a lot of energy and trouble concentrating; was hyperactive, irritable and talkative; and felt worthless, hopeless and depressed. AR 269. He believed that he had ADHD AR 269. Akerlundh noted that both manic and depressive symptoms were apparent. AR 269. Plaintiff reported anxiety and somatic symptoms and daily panic attacks. AR 271. He used cannabis daily. AR 273.

From June 17 to 20, 2014, Plaintiff was hospitalized at Riverside County Regional Medical Center after being treated in the emergency department for a multiple sclerosis flare-up that resulted in leg and knee pain. AR 276, 284-89, 292-300. X-rays indicated that Plaintiff's knees were unremarkable; ultrasound revealed no deep vein thrombosis of the legs. AR 284-89. He had no new multiple sclerosis lesions. AR 290. Plaintiff was discharged walking with a cane. AR 290. Follow-up instructions included a referral to Dr. Koshy's neurology clinic, physical therapy, mental health treatment, and Tysabri infusion. AR 290.

---

[4] Although the John Cunningham virus is usually harmless, the virus may become activated in persons with compromised immune systems, including MS patients receiving certain medications. The virus may then be carried into the brain and cause progressive multifocal leukoencephalopathy (PML), a condition in which the virus attacks the cells responsible for producing myelin, the protective covering of nerve cells. PML can be disabling or fatal. *See* www.healthline.com/health/multiple-sclerosis/jc-virus-risks-for-ms-patients (accessed November 26, 2018).

5

On June 20, 2014, psychiatrist Antonio Reantaso, M.D., conducted a psychiatric consultation regarding Plaintiff's depression and agitation. AR 276. Plaintiff was "focused on acquiring a stimulant for what he believe[d] to be 'attention deficit disorder.'" AR 276. Dr. Reantaso observed hyperactive behavior but noted that diagnosing ADHD was difficult in the course of a hospital consultation since that diagnosis requires the review of a significant data set including elementary school records. AR 276. Plaintiff had difficulty accepting that his benefits limited his treatment to the Riverside County Mental Health Clinics, which had a "no new stimulant policy." AR 276. When the doctor declined to prescribe Adderall, Plaintiff protested that he had been taking his brother's Adderall and that he would obtain the medication from a private psychiatrist. AR 277. Dr. Reantoso diagnosed:

| | | |
|---|---|---|
| Axis I | | Depressive disorder, not otherwise specified<br>Cannabis dependence<br>Rule out Attention Deficit Hyperactivity Disorder, combined type |
| Axis II | | Deferred |
| Axis III | | Multiple sclerosis per history |
| Axis IV | | Problems related to social environment, education, finances, physical health, other psychosocial stressors and unknown factors, access to mental health services, and substance related problems, as well as compliance with treatment |
| Axis V | | 65 |

AR 278.

The doctor opined that involuntary psychiatric detention was not required. AR 278. He recommended a trial prescription of Wellbutrin for control of depression and possibly ADHD-like symptoms. AR 278. He opined that Plaintiff was "not a good candidate for a stimulant, as he has been acquiring them somewhat illegally from a relative as a form of self medication." AR 278-79.

///

On July 2, 2014, after conducting a psych evaluation, Roshinie Fernando, M.D., determined that Plaintiff could benefit from psychotropic medication and prescribed Depakote. AR 268, 270, 343. Plaintiff continued to request a prescription for Adderall. AR 343. A blood sample drawn July 2, 2014, was positive for amphetamines, including high levels of amphetamines and methamphetamines; marijuana metabolites; and opiates, with a high level of hydromorphone. AR 334-45.

On August 4, 2014, Dr. Fernando noted that Plaintiff was not fully compliant with his Depakote prescription: Plaintiff complained that the pill was too big and caused nausea and vomiting. AR 336. The doctor noted that Plaintiff's complaints of nausea and vomiting predated his taking Depakote, but prescribed a trial of Olanzapine as an alternative medication. AR 336-37. Plaintiff remained irritable and angry: a verbal outburst at another doctor while discussing pain medications had resulted in Plaintiff's being banned from the family medical center. AR 336. Plaintiff was depressed and anxious, and experiencing problems with reversed sleep. AR 336. He denied substance use/abuse. AR 336. His symptoms were causing family problems. AR 336. Adderall abuse contributed to his problems. AR 337.

On August 8, 2014, Plaintiff's functioning had improved although he complained of diffuse leg pain (10/10) due to muscle spasms. AR 415. Dr. McLaughlin referred Plaintiff to pain management. AR 416.

On August 24, 2014, complaining of knee pain, Plaintiff went to the emergency room at CSJ Providence St. Joseph Medical Center, Burbank, California. AR 347. Plaintiff reported that he had recently moved to the area, had not yet seen his neurologist, and was not getting relief from Doxy Contin (*sic*). AR 347. He requested hydromorphone 4 mg. which helped his pain significantly and stated that he also required baclofen 10 mg, three times daily, for knee pain. AR

347. Emergency room physician Stanford Chin Lee, M.D., gave Plaintiff 24 HCl 4 mg. tablets, 30 baclofen 10 mg. tablets, and a cane. AR 349.

Having received three monthly Tysabri infusions, Plaintiff was "markedly improved" when he saw Dr. Koshy on September 3, 2014. AR 351. He was able to walk with a cane. AR 465.

On September 25, 2014, psychiatrist Maged Botros, M.D., conducted a complete psychiatric evaluation for the state agency. AR 370. No medical records were made available for Dr. Botros's review. AR 371. Dr. Botros obtained the medical history from Plaintiff, whom the doctor considered to be an adequate historian. AR 370. Plaintiff told Dr. Botros that he had never been psychiatrically hospitalized, never received non-hospital psychiatric treatment or counselling, and was not then seeing a psychiatrist. AR 371. He reported taking Wellbutrin XL, Zyprexa, Topamax, Baclofen, and Depakote. AR 371. Dr. Botros diagnosed:

Axis I:    Mood Disorder, NOS.
            Rule out Bipolar Disorder, NOS.
            Rule out Mood Disorder secondary to his general; medical condition, "multiple sclerosis."
            Rule out Substance "MS Medication"-Induced Mood Disorder.

Axis II:    Deferred.

Axis III:    As per medical history.

Axis IV:    Psychosocial stressors: Occupational, educational, and housing problems, and problems with access to healthcare system, all moderate in degree.

Axis V:    Current GAF: 51 to 60.
            Past year is unknown.

AR 373.[5]

---

[5] The Global Assessment of Functioning (GAF) scale is a rating from 0 to 100 and considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. *Diagnostic and Statistical Manual of Mental Disorders*, 32-35 (4th ed. American Psychiatric Association 1994). A GAF of 51-60 corresponds to moderate symptoms or moderate difficulties in social, occupational, or school functioning. *Id.*

Dr. Botros opined that Plaintiff was normal and not limited in any functional areas. AR 374. He opined that Plaintiff's mental health impairment could possibly improve after the next twelve months. AR 375.

By October 2, 2014, Plaintiff had left his parents' home and moved in with his girlfriend. AR 412. He was feeling better. AR 412. Nonetheless, Plaintiff complained of 10/10 pain. AR 413. Dr. McLaughlin advised Plaintiff that he would not prescribe short acting opiates and referred Plaintiff for pain management. AR 413.

By the time Plaintiff saw psychiatrist Dr. Fernando on November 24, 2014, he was sometimes using a wheelchair. AR 337. He sometimes took Olanzepine, sometimes took Depakote from the old prescription, and sometimes took Wellbutrin which had been prescribed by his primary care physician. AR 337-388. Plaintiff reported verbal outbursts at his parents and said that he was no longer living with his family. AR 337. He was coping better with his medical problems. AR 337. Plaintiff did not keep his December 2, 2014, appointment with Dr. Fernando. AR 340.

On December 19, 2014, Plaintiff told Dr. McLaughlin that he had moved out of his parent's home, started and stopped using methamphetamine, begun seeing a psychiatrist, and started medications for bipolar disorder. AR 409. Although pain was generally less severe than before, Plaintiff was experiencing sharp pains in his back and down his right arm. AR 409.

At Plaintiff's January 16, 2015, appointment with Dr. McLaughlin, he reported that his pain was not well-controlled. AR 406-07. The doctor observed gait disturbance. AR 406. MRI imaging revealed that Plaintiff's brain lesions were slightly improved. AR 407.

///

///

When Dr. Koshy examined Plaintiff on January 21, 2015, his walk was unstable and he was using a cane. AR 463. Plaintiff was experiencing episodic weakness and numbness and reported stabbing pains throughout his body and increased back pain. AR 463.

At Plaintiff's February 13, 2015, appointment with Dr. McLaughlin, Tysabri was working well. AR 401. Plaintiff complained of problems sleeping. AR 410. A spinal examination revealed normal mobility and curvature with no spinal tenderness. AR 402. Both shoulders had the full range of motion. AR 402.

On February 25, 2015, Plaintiff told Dr. Fernando that he was experiencing frequent flare-up and needed to use a walker or wheelchair. AR 387. He had "made up" with his parents and was again living at home. AR 387. Although Plaintiff reported continued attention problems, he was much calmer, his sleep had improved, and he was no longer having affective symptoms or persistent anxiety or panic. AR 387.

Just before Plaintiff's April 2015 neurology appointment, a nurse misplaced Plaintiff's IV line, resulting in his missing a Tysabri infusion. AR 461. Without the infusion, Plaintiff experienced lower back pain and more instability and falls. AR 462.

On May 5, 2015, Dr. McLaughlin performed a routine physical. AR 397. Although Plaintiff was doing well on his current regimen, he had the JC virus and could not continue to receive Tysabri. AR 397. Plaintiff complained of pain rated 8/10. AR 398.

On May 18, 2015, Dr. Koshy noted that recent MRI studies showed fewer lesions of Plaintiff's brain and spinal cord. AR 459. His gait remained spastic. AR 459. Dr. Koshy planned to continue Tysabri infusions until August 2015, then switch to Tecfidera. AR 460.

On June 26, 2015, Dr. McLaughlin noted that Plaintiff's pain was relatively well controlled. AR 593. Plaintiff was walking smoothly with a cane. AR 594.

10

In August 2015, Dr. McLaughlin saw Plaintiff for intermittent chest pain and shortness of breath. AR 596. Plaintiff reported depression. AR 596-97. Because Plaintiff was smoking marijuana daily, he was coughing more. AR 596. Dr. McLaughlin advised Plaintiff against smoking marijuana and tobacco. AR 598.

In March 2016, Dr. Koshy discontinued Plaintiff's infusions of Tysabri after noting an increase in the JC virus titers. AR 624. In April 2016, Dr. Koshy began treating Plaintiff with Tecfidera. AR 621.

When Plaintiff saw Dr. McLaughlin on June 24, 2016, Gabapentin was not helping the numbness in his legs. AR 612. As the weather got warmer, Plaintiff was falling more often. AR 612.

The neurological consultative examination (AR 366-69) and a Multiple Sclerosis Impairment Questionnaire (AR 376-82) are detailed in the discussion below.

### IV. Standard of Review

Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits. "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted). When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v.*

*Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and internal quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

## V. **The Disability Standard**

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 416.920(a)-(f). The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled. 20 C.F.R. §§ 416.920(a)(4). The ALJ must consider objective medical evidence and opinion testimony. 20 C.F.R. §§ 416.927; 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had

medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform his past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level. 20 C.F.R. §§ 416.920(a)-(f).

**VI.  Summary of the ALJ's Decision**

Using the Social Security Administration's five-step sequential evaluation process, the ALJ determined that Plaintiff did not meet the disability standard. AR 21-30. The ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date of April 29, 2014. AR 21. Plaintiff's severe impairments included multiple sclerosis and affective disorder. AR 21. The severe impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d); 416.925; and 416.926). AR 21-22.

The ALJ determined that Plaintiff could lift and carry 20 pounds occasionally and ten pounds frequently; stand or walk for four hours and sit for six hours in an eight hour work day; push and pull 20 pounds occasionally and 20 pounds frequently; occasionally climb ramps and stairs but never climb ladders, ropes or scaffolds; and occasionally balance, stoop, kneel, crouch and crawl. AR 23. Plaintiff should avoid all exposure to hazards including machinery and heights, and was limited to simple, repetitive tasks and occasional interaction with the public. AR 23.

Plaintiff had no past relevant work. AR 28-29. Relying on the vocational expert's testimony, the ALJ concluded that there were jobs that exist in significant numbers in the national economy that Plaintiff could perform. AR 29. Accordingly, the ALJ found that Plaintiff was not disabled. AR 30.

**VII.  The ALJ's Evaluation of Medical Evidence**

Plaintiff challenges the Commissioner's determination of his residual functional capacity, contending that the ALJ erred in giving little weight to the opinions of Nathan McLaughlin, M.D.,

13

Plaintiff's primary care physician. Doc. 13 at 7-8. Plaintiff adds that the ALJ should have understood the symptoms of MS are subject to exacerbation and remission, precluding Plaintiff's employment. Doc. 13 at 7-8. In particular, Plaintiff relies on Dr. McLaughlin's separate, conclusory opinion that Plaintiff is unable to sustain gainful employment. Doc. 13 at 8 (*see* AR 556) The Commissioner disagrees, contending that the ALJ properly rejected Dr. McLaughlin's conclusory opinion as inconsistent with the medical record in favor of the opinions of examining physician Dr. Maze, and agency physicians Drs. Amon and Vaghaiwalla. Doc. 16 at 7-12. The Court finds that the ALJ properly relied on the record as a whole.

In making his argument, Plaintiff addresses only the ALJ's determination in relation to Plaintiff's physical impairment and does not address the ALJ's analysis of Plaintiff's mental health impairment. Accordingly, the Court will examine the hearing decision only to the extent it applies to Plaintiff's physical impairment of multiple sclerosis.

### A. Medical Opinions

#### 1. Dr. McLaughlin's Opinions

On February 13, 2015, Dr. McLaughlin, a family practitioner, completed a form, apparently provided by Plaintiff's counsel, entitled Multiple Sclerosis Impairment Questionnaire. AR 376-82. Dr. McLaughlin represented that he had treated Plaintiff for multiple sclerosis beginning August 5, 2014, after the disease had been diagnosed by others based on evidence of multiple sclerosis lesions detected with magnetic resonance imaging.[6] AR 376, 377. Clinical findings indicated that Plaintiff experienced balance problems, unstable walking, weakness in flexing and extending his knees, numbness and tingling of both legs, and depression. AR 376-77. Symptoms included leg weakness, chronic back and leg pain, and spasticity. AR 377. The most frequent and/or severe finding was weakness. AR 377. Dr. McLaughlin opined that Plaintiff's symptoms were consistent with his multiple sclerosis diagnosis. AR 378.

///

---

[6] The record does not include an opinion from Dr. Koshy, the neurologist more directly responsible for treating Plaintiff's MS.

14

Plaintiff's symptoms were subject to exacerbation and remission every one to three months, generally as a result of Plaintiff's missing medication. AR 379. His symptoms did not vary as a result of emotional factors. AR 379. Pain was periodically so severe as to interfere with attention and concentration. AR 379. Nonetheless, Dr. McLaughlin opined that Plaintiff was capable of low stress work. AR 379. Plaintiff was able to sit four hours in an eight-hour work day; stand or walk for zero to one hour; frequently lift and carry up to ten pounds; and occasionally lift and carry ten to twenty pounds. AR 380-81. Although Plaintiff would have good days and bad days, his illness was likely to absent him from work less than one day per month. AR 381.

On May 6, 2015, Dr. McLaughlin also provided a signed letter "to whom it may concern":

> Martin Soroka is my patient. He has been established with me since August of 2014 and I see him on a regular basis. He is diagnosed with multiple sclerosis as his main medical disorder and follows with Neurology here in addition to visits with me. His condition waxes and wanes, however he almost always needs at least a cane to walk and is periodically confined to a wheelchair. I do not believe he could sustain gainful employment with his condition.

AR 556.

### 2. Consulting Neurological Evaluation

On September 11, 2014, neurologist Sarah L. Maze, M.D., provided a consultative opinion requested by the state agency. AR 366-69. Dr. Maze confirmed much of the information included in the questionnaire completed by Dr. McLaughlin, including Plaintiff's diagnosis of multiple sclerosis based on MRI studies that revealed brain and spine lesions, the numbness of Plaintiff's legs, depression, unsteadiness in ambulation and back pain. AR 367. A motor examination indicated that Plaintiff's strength was intact (5/5) or minimally reduced (5-/5). AR 368. Grip strength was 20/20 on the right and 15/15 on the left. AR 368. However, vibratory sense was reduced at the ankles, reflexes were slower than normal, and the finger-nose-finger exercise was slow bilaterally. AR 368.

///

Although Plaintiff came to the examination in a wheelchair, Dr. Maze found that Plaintiff was capable of walking without an assistive device. AR 369. She noted that Plaintiff appeared to have an underlying psychiatric disorder. AR 369.

In Dr. Maze's opinion, Plaintiff could push, pull, lift, and carry 20 pounds occasionally and ten pounds frequently; stand and walk two hours in an eight hour work day; sit six hours in an eight-hour workday; and frequently perform fine motor activities with both hands. AR 369.

### 3. Agency Physicians' Opinions

In the initial disability determination, S. Amon, M.D., opined that Plaintiff could lift and carry 20 pounds occasionally and ten pounds frequently; stand and walk four hours and sit six hours in an eight hour workday; and had unlimited ability to push and pull. AR 89-90. Plaintiff could never climb ladders, ropes or scaffolds, but could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. AR 90. Plaintiff's only environmental limitation was avoidance of all exposure to hazards such as machinery and heights. AR 91. On reconsideration, B. Vaghaiwalla, M.D., provided the same opinion of Plaintiff's residual functional capacity. AR 106-108.

### B. Applicable Law

The opinions of treating physicians, examining physicians, and non-examining physicians are entitled to varying weight in disability determinations. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual. *Id.*; *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996). The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990). An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons. *Lester*, 81 F.3d at 831. In contrast, a contradicted opinion of a treating professional may be rejected for "specific and legitimate" reasons. *Id.* at 830. However, the opinions of a treating or examining physician are "not

///

necessarily conclusive as to either the physical condition or the ultimate issue of disability."
*Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999).

The opinion of a non-examining physician may constitute substantial evidence when it is "consistent with independent clinical findings or other evidence in the record." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). Such independent reasons may include laboratory test results or contrary reports from examining physicians and Plaintiff's testimony when it conflicts with the treating physician's opinion. *Lester*, 81 F.3d at 831, citing *Magallanes v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989).

### C. The ALJ's Determination is Specific, Legitimate and Based on the Record as a Whole

The ALJ gave little weight to Dr. McLaughlin's opinions, finding that the opinions were not consistent with the minimal reductions of muscle strength in Plaintiff's legs, the normal neurologic findings, and Dr. McLaughlin's own treatment notes. AR 26-27. Further, the doctor himself attributed Plaintiff's exacerbations to missing medication. AR 27. The ALJ concluded that the record did not support Dr. McLaughlin's opinion on physical limitations, particularly standing, walking, and sitting. AR 27.

The ALJ gave significant, but not great weight, to the opinion provided by Dr. Maze. AR 27. In particular, the ALJ found that the "evidence demonstrate[d] that the claimant was able to stand and walk for up to four hours." AR 27. Acknowledging that multiple sclerosis is a progressive disease, the ALJ found that Plaintiff had so far demonstrated "only mildly reduced strength and sensation of the lower extremities." AR 27.

Finally, the ALJ gave great weight to the opinions of the agency physicians, each of whom offered the same opinion of Plaintiff's residual functional capacity. AR 27. The ALJ agreed with the agency physicians that "claimant has shown a positive response to initial treatment for multiple sclerosis" and the physical exam findings did not support more restrictive limitations. AR 27.

Before reviewing the ALJ's analysis of the various opinions of Plaintiff's residual functional capacity, the Court notes that the ALJ correctly disregarded Dr. McLaughlin's separate letter opinion, which stated that Plaintiff was disabled (*see* AR 556). A conclusory opinion that a claimant is disabled is entitled to little weight since the Commissioner "will not give any significance to the source of an opinion on issues reserved to the Commissioner," including whether a claimant is disabled. *Calhoun v. Berryhill*, 734 Fed.Appx. 484, 487 (9th Cir. 2018) (quoting 20 C.F.R. § 404.1527(d)(3)) (citing *McLeod v. Astrue*, 640 F.3d 881, 884-85 (9th Cir. 2011).

With regard to the remaining opinions, Dr. McLaughlin, Dr. Maze, and the agency physicians agreed that Plaintiff was generally capable of light work, that is lifting and carrying twenty pounds occasionally and ten pounds frequently. The material differences appear in the doctors' opinions of the duration of Plaintiff's ability to sit, stand, and walk. As set forth above, Dr. McLaughlin opined that Plaintiff could sit four hours and stand or walk for up to one hour in an eight hour workday. Dr. Maze opined that Plaintiff could sit for six hours and stand or walk for two hours. The agency physicians agreed that Plaintiff could sit for six hours and opined that he could stand or walk for four hours. The ALJ found that Plaintiff could sit for six hours and stand or walk for four hours in an eight hour work day.

In reaching the determination, the ALJ considered the record as a whole. He first rejected Plaintiff's statements of the intensity, persistence and limiting effects of his symptoms as inconsistent with Plaintiff's representations of his activities of daily living. AR 24. For example, Plaintiff depicted himself as nearly bed-ridden and dependent on his mother for help with even the most basic tasks, such as eating. AR 24. In contrast, Leonty Soroka testified that Plaintiff was capable of living alone and of living with his girlfriend. AR 24. The ALJ found that Plaintiff's ability to participate in daily activities was inconsistent with Plaintiff's representations of his physical abilities. AR 24. The ALJ also found Plaintiff's testimony that he was wholly dependent on a cane or a wheelchair was inconsistent with medical evidence that he retained 5/5 strength and had significantly improved with medication. AR 24. Plaintiff himself reported that

he was improved and more capable of walking after receiving the infusion treatments. AR 25, 351.

The ALJ's references to the record are not exhaustive. His reasoning is further supported by evidence within the medical records including Plaintiff's ability to walk with a cane (AR 463, 465); sometimes to walk smoothly (AR 594); and to live independently or with his girlfriend (AR 409, 412). Dr. Maze observed that Plaintiff was capable of walking without an assistive device. AR 369. Physical examinations revealed normal spinal and shoulder mobility and the absence of spinal tenderness. AR 402. MRI reports indicate reductions in the number and severity of brain and spinal lesions. AR 303-06, 407, 459. Multiple reports indicated that Plaintiff improved when he complied with prescribed treatment. AR 351, 397, 470. Ten months after his MS diagnosis, Plaintiff was calmer, had improved sleep, and no longer experienced affective symptoms, persistent anxiety or panic. AR 387. Plaintiff himself reported that he was feeling better. AR 412.

"[A]n ALJ is responsible for determining credibility and resolving conflicts in medical testimony." *Magallanes*, 881 F.2d at 750. An ALJ may choose to give more weight to opinions that are more consistent with the evidence in the record. 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) ("the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion"). The Court is not required to accept Plaintiff's characterization of his treatment records. Even if this Court were to accept that the record could support Plaintiff's opinion, the record amply supports the ALJ's interpretation as well. When the evidence could arguable support two interpretations, the Court may not substitute its judgment for that of the Commissioner. *Jamerson*, 112 F.3d at 1066.

**VIII. Conclusion and Order**

Based on the foregoing, the Court finds that the ALJ's decision that Plaintiff is not disabled is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of Court is directed to enter judgment in favor of

Defendant, Nancy A. Berryhill, Acting Commissioner of Social Security, and against Plaintiff, Martin Soroka.

IT IS SO ORDERED.

Dated: **November 28, 2018**  /s/ **Gary S. Austin**
UNITED STATES MAGISTRATE JUDGE